## In re Schmidt

C.P. of Lawrence County, Nos. 84 of 2014, JV; 85 of 2014, JV

*Diane Shaffer*, for Commonwealth.
*Aaron M. Cangey*, for defendant.

MOTTO, *P.J.*, Dec. 2, 2014—Before the court for disposition is the petition of the Commonwealth to transfer the above captioned proceedings to adult criminal court. For the reasons hereinafter set forth, the court finds that the Commonwealth has met its burden to prove by a preponderance of the evidence that the public interest is served by the transfer of this case to criminal court and that the child is not amenable to treatment, supervision or rehabilitation as a juvenile and that the requirements of 42 Pa.C.S.A. §6355(a) are satisfied.

At Case No. 84 of 2014, the child is charged with possession of a controlled substance with intent to deliver, an unclassified felony, in violation of §13(a)(30) of the Controlled Substance, Drug Device and Cosmetic Act and possession of a controlled substance, an unclassified misdemeanor, in violation of §13(a)(16) of the Controlled Substance, Drug Device and Cosmetic Act. At Case No. 85 of 2014, the juvenile is charged with corrupt organizations, a felony of the first degree, in violation of §911(b)(2) of the Crimes Code; delivery of a controlled substance, an unclassified felony, in violation of §13(a)(30) of the Controlled Substance, Drug Device and Cosmetic Act (three counts); criminal conspiracy to deliver a controlled substance, an unclassified felony, in violation of §903(a)(1) of the Crimes Code (four counts); and criminal use of a communication device, a felony of the 2nd degree, in violation of §7512(a) of the Crimes Code, (two counts).

The transfer of juvenile proceedings to criminal proceedings is governed by 42 Pa.C.S.A. §6355. That section provides that after a petition has been filed alleging delinquency based on conduct which is designated a crime

under the laws of this commonwealth, the court may rule that this chapter (relating to juvenile proceedings) is not applicable and that the offense should be prosecuted, and transfer the offense to the criminal division of the court. Transfer is appropriate if the child was fourteen or more years of age at the time of the alleged conduct, and that after a hearing, the court finds that there is a *prima facie* case that the child committed the delinquent act alleged, that the delinquent act would be considered a felony if committed by an adult and that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution. In determining whether the public interest can be served by a transfer, the court shall consider the factors that are set forth in §6355(a)(4)(iii)(A) through (G)(I-IX).

The burden of establishing by a preponderance of evidence that the public interest is served by a transfer of the case to criminal court and that the child is not amenable to treatment, supervision, or rehabilitation as a juvenile rests with the commonwealth. 42 Pa.C.S.A.§6355(g).

At Case No. 84 of 2014, the Commonwealth presented a *prima facie* case that the child committed the offenses of possession of a controlled substance with intent to deliver as well as simple possession. On June 16, 2014, New Castle Police Officer Brandon Hallowich conducted a traffic stop of a motor vehicle occupied by the juvenile. The driver of the vehicle was one Jamal Hill, a paramour of the juvenile's mother and Stacy Heaney, the juvenile's mother. The juvenile M.R.S. was seated in the back seat of the vehicle together with another female juvenile and an infant. A search of the vehicle yielded a can of what appeared to be Sprite, which contained a hidden compartment. Located therein was a baggie containing eight Xanax pills and eight grams of heroin. A search of

the juvenile's person yielded $3,550 in cash. The amount of $1,086 in cash was located on the person of Jamal Hill, once taken into custody, the juvenile immediately stated that the heroin and the "xannies" were his.

At Case No. 85 of 2014, the commonwealth established a prima facie case as to the charges of corrupt organizations, delivery of a controlled substance, criminal conspiracy and criminal use of a communication facility. The Commonwealth proved that over a period of at least one year, the juvenile was part of a organization involved in the distribution of heroin known as the "Schmidt Heroin organization" and that the juvenile himself was the second largest supplier of Heroin for distribution within the organization answering directly to his father as the head of the organization M.R.S. supplied heroin on a regular basis, twice a week or more, to mother's paramour, Jamal Hill and to others. On February 21, 2014, the juvenile delivered and sold .5 grams of heroin to a confidential informant. on February 21, 2014, the juvenile entered into an illegal criminal conspiracy with one Mark Ortiz to deliver .5 grams of heroin. On February 21, 2014, the juvenile utilized a telephone as a communication facility in order to arrange and accomplish the delivery of .5 grams of heroin to a confidential informant. On April 22, 2014, the juvenile conspired with his mother's paramour, Jamal Hill, and his mother, Stacy Heaney, to accomplish the delivery of 3.8 grams of heroin to a confidential informant. On April 28, 2014, the juvenile did deliver 5.1 grams of heroin to a confidential informant. On April 28, 2014, the juvenile conspired and agreed with one Jamie Clobus and his mother, Stacey Heaney, to deliver 5.1 grams of heroin to a confidential informant. On April 28, 2014, the juvenile utilized a communication facility, specifically a telephone, to arrange a delivery of 5.1 grams of heroin to

a confidential informant. On May 21, 2014, the juvenile delivered 9.8 grams of heroin to a confidential informant, on May 21, 2014, the juvenile entered into an agreement with one Michael Lee Schmidt and did conspire with him to accomplish the delivery of 9.8 grams of heroin, on May 30, 2014, the defendant and Michael Lee Schmidt, Anthony Schmidt and Patrick Sinibaldi did meet at the residence of Michael Lee Schmidt as members of the above described corrupt organization, at which time the organization had been resupplied with a quantity of heroin in order to enter into a conspiracy and agreement for the distribution and delivery of the supply of heroin.

In order to effectuate a transfer to criminal prosecution, the court must find that there are reasonable grounds to believe that the public interest is served by the transfer for criminal prosecution considering the factors hereinafter set forth, which will be addressed seriatim.

(A) The Impact of the Offense on the Victim or Victims

No evidence was submitted on this factor.

(B) The Impact of the Offense on the Community

Prior to the arrest of the juvenile and his co-defendants, investigating officers had noticed a dramatic increase in heroin distribution in the city of New Castle as well as an increase in heroin overdoses. The investigation revealed a structured organization which is now referred to as the Schmidt Heroin Organization. The investigation revealed that the criminal enterprise introduced into the city of New Castle and Lawrence County area large quantities of heroin each week. On the specific day of arrest of all defendants, $50,000.00 in cash was seized. The juvenile was the second highest distributor of heroin in this organization. The highest distributor was the juvenile's

father as head of the organization.

(C) The Threat to the Safety of the Public or Any Individual posed by the Child

In addition to the juvenile's role in the Schmidt Heroin Organization, evidence showed that the juvenile regularly carried a firearm. At the time of the juvenile's arrest, he was under supervision in the office of Juvenile Probation of Lawrence County as the result of having been charged as a juvenile with the offense of Reckless Endangerment, such offense having involved the use of a firearm.

(D) The Nature and Circumstances of the Offense Allegedly Committed by the Child

In determining that a *prima facie* case existed and in addressing the impact of the offense on the community, the court has already described the nature and circumstances of the offenses charged. The level of a juvenile's involvement in the organization was such that he would obtain from his father approximately 100 grams of heroin at least twice per week, or more, which he would then distribute.

(E) The Degree of the Child's Culpability

The court has already determined that the commonwealth proved a *prima facie* case as to each of the offenses with which the juvenile is charged. The evidence indicated that the juvenile committed these acts with the full knowledge of the illegality of the acts. The juvenile's age and mental state, including level of intelligence, requires a finding that he knowingly engaged in the acquisition and distribution of large amounts of heroin for financial gain, and. for a period of time himself traveled to Youngstown, Ohio to obtain the supply of heroin for the organization until his father directed him not to do so any further.

(F) The Adequacy and Duration of Dispositional Alternatives in the Juvenile and Criminal Justice Systems

Both the Juvenile system and the criminal system have facilities that address the needs of the juvenile particularly with respect the juvenile's drug addiction. However, jurisdiction over the juvenile would end once he obtained the age of 21. Thus, juvenile jurisdiction would end over the defendant in approximately two years and seven and one-half months from now, and even less time available for rehabilitation considering that juvenile procedure would still require time to address the adjudicatory and dispositional procedures before placement of the juvenile would take place.

(G) Whether the Child is Amenable to Treatment, Supervision or Rehabilitation as a Juvenile

(I) Age

The juvenile is eighteen years of age having been born on July 17, 1996.

(II) Mental Capacity

The juvenile has been assessed by two mental health experts for the commonwealth and by one for the juvenile. All of these experts have indicated that the juvenile is highly intelligent. The juvenile suffers from anti-social personality disorder.

(III) Maturity

The juvenile exhibits a level of maturity well beyond his years. At age seventeen, he maintained a relationship with a twenty-eight year old female drug addict as his girlfriend. Since his parents have been separated for a considerable length of time and both involved in illegal drug activity, the juvenile for most of his life had to fend

for himself, taking up residence with different relatives, including his maternal grandfather, his mother, or his father at various times. He is mature in the sense that he is highly sophisticated and does not think and act as a child but as someone who is comfortable with a criminal lifestyle involving drug addiction and the financial reward that comes from distribution of large quantities of controlled substances.

(IV) The Degree of Criminal Sophistication Exhibited by the Child

The juvenile's criminal sophistication is evident from his high level of placement in the hierarchy of the heroin distribution organization. He was able to engage in a conspiracy with adult individuals and maintain higher placement in the organization over adult individuals much older than he.

The juvenile also exhibited criminal sophistication in the manner in which he accomplished deliveries of controlled substances, it was his habit when arranging a delivery to identify a location where the delivery was to occur, and then, in order to further avoid detection, change the location at the last minute. It has been above noted that when he was found in possession of the Xanax pills and the eight grams of heroin, they were found hidden in a Sprite can that contained a false compartment.

The juvenile further exhibited criminal sophistication in the manner in which he was able to conceal his criminal involvement while under supervision in the juvenile justice system, while engaged in his criminal enterprise, he was able to manipulate his juvenile probation officer to the degree that his probation officer considered him to be a perfectly compliant juvenile on probation. The juvenile probation office of Lawrence County never suspected

that the juvenile had any issue with addiction or that he was engaged in any criminal enterprise involving drugs. It was never felt that there was any need to drug test him or to have him assessed for any drug or alcohol issue. The juvenile always maintained close contact with his probation officer, taking every precaution not to arouse any suspicion in himself while under supervision.

(V) Previous Records

No previous records were introduced into evidence that were noteworthy. No school records exist as juvenile left school at an early age.

(VI) Prior Delinquent History and Previous Attempts of Rehabilitation

The juvenile's first contact with the Juvenile Probation Office of Lawrence County occurred in August of 2011 in order to address his truancy. He was assessed and referred to the community resource program. Although the assessment of him at that time did not indicate any problems with drugs and no reason to drug test him were discovered, efforts to keep him enrolled in school ultimately failed. The assessment was incorrect as M.R.S. was involved in drugs at that time.

In May of 2012, the juvenile was again subject to an informal process in the office of Juvenile probation for contempt for failure to pay and to participate in the amends program. His participation in the amends program was for not attending school for which he was to perform fifty hours of community service and an additional twenty hours of community service for involvement in the juvenile system for driving without a license and failure to pay the costs and fines.

In November of 2013, the juvenile was charged with

various offenses that ultimately resulted in him coming under supervision on a charge of Reckless Endangering. His assessment indicated no indication of drug use. The assessment was again incorrect. By this time he had withdrawn from school and his management plan included working on a G.E.D. He reported living with his grandfather. No drug problem was ever reported or discovered by the juvenile probation office. He was never drug tested until after he was arrested on the pending charges at which time he was discovered to be positive for Oxycontin, Marijuana and opiates, as well as other drugs.

During the entire time that he was in contact with the juvenile probation office of Lawrence County, he was in fact addicted and involved with the selling drugs, at least during the time that he was on formal probation. All efforts to rehabilitate the juvenile by the Lawrence County Juvenile probation office were ineffective to identify his problem and otherwise unsuccessful.

It is also worth noting that while he was under supervision by the juvenile probation office, he was also under supervision in Ohio as a result of which, the Ohio juvenile justice system directed that he undergo treatment for drug abuse. He was able to conceal from the Lawrence county juvenile probation office his involvement in Ohio and further, the Ohio probation office had no awareness of any involvement of the juvenile in the Lawrence County juvenile probation office. The juvenile's rehabilitation counselor had no awareness of the juvenile's involvement with the Lawrence county juvenile probation office.

What is noteworthy is that with all of the juvenile's interaction with the aforesaid agencies, Lawrence County juvenile probation, Ohio juvenile probation and the rehabilitation agency, the juvenile was able to convince

all of these entities that he was following the rules laid down for him, while in reality he was involved in the use and delivery of controlled substances as part of a criminal enterprise in which he was the second largest supplier.

(VII) Whether the Child Can Be Rehabilitated Prior to the Expiration of the Juvenile Court Jurisdiction

The Commonwealth and the defendant each provided expert testimony regarding this issue. The commonwealth presented the testimony of Jeffrey Sunderman, a counselor with Clover Psychological Association, as well as the testimony of psychologist Cathy Clover. The testimony done by Mr. Sunderman was done under the supervision of Cathy Clover. The report that was generated as the result of the evaluation by Mr. Sunderman and Ms. Clover was co-authored by them. Clover Psychological opined that the juvenile is at high risk for future substance abuse, antisocial activities and failed treatment experiences and that as such, the juvenile is not amenable to treatment or intervention as afforded by the juvenile justice system. This opinion was arrived at after the juvenile was subject to a number of assessment tools including the adolescent attitudes, beliefs and myths inventory; the Buss-Durkey hostility inventory; the opioid risk tool, the trauma symptom checklist for children; the behavioral rating inventory of executive function; the problem orientated screening instrument for teenagers; the event drawing series; the hare psychopathy checklist-screening version; the structured assessment of violence risk in youth; and the risk sophistication treatment inventory.

Clover Psychological determined that the juvenile is intelligent, capable of learning and understands cause and effect; and acknowledges his deception while on probation; Clover Psychological concluded that the juvenile failed to

benefit from supervised intervention and prior treatment opportunities; that he does not see a need for addiction therapies and that he minimizes the impact of his actions and effect on others; his substance abuse addiction is significant; that he does not have positive family support; that he acknowledges that he is a skilled manipulator and that he is not self-motivated.

Clover Psychological further opined that his risk of recidivism is evident by the fact that he is addicted to heroin and opioids and is a multi-substance abuser and that, although he is clean and sober at present, heroin and opioid addiction has one of the highest incidents for repeated relapse; that his propensity for violence has escalated as he has aged; that he has engaged in illegal behavior across state lines; has engaged in repeated acts of violence of antisocial behavior and that he has not demonstrated a willingness or need to comply with social boundaries and institutions, i.e. school dropout, multiple arrests, failed drug and alcohol treatment and violation of probation. Further, the juvenile's antisocial behaviors and thinking/cognitive distortions are significant; that he has few or no relationships that are positive and healthy and that he is impulsive.

The court finds that Clover Psychological has based its opinions on established practices and evaluation methods that have been empirically supported by research and that the evaluations used are consistent with the current best practice standards. Cathy Clover in her testimony meticulously described each testing tool and assessment method used by her office and how each testing tool was empirically-driven and research replicated as an assessment tool.

Cathy Clover concluded that she did not see the

juvenile as amenable to services available to the juvenile court primarily because of the length of the issues he has experienced, and the level of antisocial psychopathy present in him. His adjustment disorder and antisocial personality is the product of a long and pervasive pattern that he has displayed since a very early age, at least since age eleven. Most of the juvenile settings that he could be placed in usually hold juveniles only until the age of eighteen and if they do hold individuals beyond the age of eighteen usually encounter the individual before age eighteen. The court finds the opinions of clover psychological to be credible and compelling.

(VIII) Probation or Institutional Reports

The juvenile is currently in shelter care at Keystone Adolescent. William Fraley supervises the juvenile and deals with him on a daily basis. Mr. Fraley describes the juvenile as doing well in shelter care, helps other juveniles, helps his teacher, is respectful, his grades are excellent and he is doing well is shelter care. The juvenile has had no issues since being in shelter care. He is described as a "good kid" with a "good head on his shoulders", very intelligent and in a bad situation. Mr. Fraley states from his personal perspective, the juvenile appears to be taking what's coming to him in his placement situation with sincerity.

(IX) Discussion

The juvenile court must consider all the factors set forth in the juvenile act when determining whether to certify a youth for adult prosecution. *Commonwealth v. Jackson*, 555 Pa. 37, 722 A.2d 1030 (1999). In order to properly certify a juvenile to be tried as an adult, the court must make a record which accurately reflects the basis for its decision to transfer the case and demonstrates the

court's careful consideration to the certification petition. *Commonwealth v. Menzer*, 698 A.2d 87 (Pa. Super. 1997). The certification judge enjoys broad discretion in making a determination on whether to certify a juvenile for adult prosecution. The certification decision must be supported by the record and boilerplate recitation of the statutory factors is insufficient to permit meaningful appellate review of a certification decision. *Commonwealth v. Jackson, Supra.* The certification of a juvenile for trial as an adult depends upon complex balancing of numerous factors. *Commonwealth v. McDonald*, 399 Pa. Super. 250, 582 A.2d 328.

In the case of *In Re: Kline*, 15 Pa. D.& C.3d 436 (1980) where a juvenile accused of various offenses was almost age eighteen, had maturity more nearly that of an adult than a child, and had not been impressed by prior juvenile probation services with the consequences of his criminal conduct, a petition to transfer the case to criminal division was granted.

The court here concludes that the Commonwealth's petition to transfer this case to the criminal division of this court should be granted.

The juvenile here was nearly eighteen years of age at the time of the criminal conducted complained of and attained the age of eighteen shortly after his arrest. He has been found to be highly intelligent and his maturity level is more nearly that of an adult than that of a child. He has exhibited a high degree of criminal sophistication both in the ability to commit the crimes with which he is charged and in his ability to conceal his criminal activity both from law enforcement and from those having supervision over him. He has had significant prior involvement in the juvenile justice system which was not only unsuccessful in

its efforts to rehabilitate him but also a failure in terms of the ability to even detect the level of his criminal activity or even that he suffered from extreme opioid addiction.

The progression of these proceedings in juvenile court, if resulting in an adjudication and eventual disposition, would leave only approximately two years in which the juvenile could potentially be rehabilitated. The court does not believe that two years is enough to address behaviors that have been ingrained in this juvenile since at least the age of eleven. He suffers from an antisocial personality diagnosis, it is not reasonable to think that with the level of his addiction and his antisocial nature and with length of time that he has considered criminal activity to be a normal part of his life that rehabilitation in the juvenile system can occur in two or two and one-half years.

The juvenile was subjected to an intensive evaluation by Clover Psychological. The battery of tests to which he was subject were evidence and research based and consisted of the best practices available in the area of forensic psychology. The opinions afforded by Clover Psychological are consistent not only with the results of the testing afforded to the juvenile but also consistent with his age, maturity level and degree of criminal sophistication that he has exhibited.

The court has carefully considered the testimony of Dr. Douglas Bogdan who concluded that M.R.S. is amenable to treatment in the juvenile division. Although Dr. Bogdan performed a thorough evaluation, and has significant experience in dealing with juveniles, the court finds that the actual facts of the case, as the court finds them, provide greater support to the opinion of Clover Psychological.

The court has carefully considered the well-reasoned argument presented by counsel for the juvenile,

significantly that he is a product of an environment where he had no parental supervision and was induced to enter this life of criminal activity by his own parents and family members, while such circumstance is clearly a mitigating factor, it does not change the fact that the behaviors that are criminal in nature have been ingrained in him since an early age. The juvenile argues that taking him away from the criminal influences of his parents and other relatives will remove him from the opportunity to engage in criminal activity and that he should have the further opportunity to show that he can leave a crime free life when subject to positive influences. The juvenile further points to the fact that he is doing well in shelter care since he is away from the influences of his parents. However, the juvenile has shown a remarkable ability to appease by manipulation those who exercise authority over him and to conceal his proclivity to engage in criminal behavior. Although the court may believe that he would be able to demonstrate positive behavior while in juvenile confinement, this factor would not provide him with the specific rehabilitation and treatment that he would need in order to change his behavior once released from placement. In fact, the greater likelihood is that once he is away from supervision given his present level of addiction and proclivity to criminal conduct, he would in fact return to criminal conduct and addiction without the proper steps taken to rehabilitate him. The court further finds that these steps require a longer period of treatment and supervision than is currently available under the jurisdiction of the juvenile act. Therefore, the court will grant the petition of the commonwealth and transfer and certify this case to the criminal division of this court.

## ORDER OF COURT

And now, this 24th day of December, 2014, after

consideration of the Commonwealth's petition to transfer proceedings to adult criminal court, and after hearings held thereon, and in accordance with the accompanying opinion of even date herewith, it is ordered and decreed that the Commonwealth's petition to transfer proceedings to adult criminal court is granted and the above captioned case is hereby transferred from the juvenile division of this court to the criminal division of this court.

A hearing to determine bail is hereby scheduled for the 5th day of December, 2014 at 9:00 o'clock a.m. in Courtroom #1.

The defendant shall remain detained at Keystone Adolescent pending the determination of bail and further order of court pursuant to 42 Pa.C.S.A. §6327(d).

The Commonwealth shall file a criminal information within ten (10) days of the date of this order, and shall place this case on the arraignment list for January, 2015.